UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| STEAK N SHAKE ENTERPRISES, INC., and STEAK N SHAKE, LLC, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) Case No. 1:21-cv-02131-TWP-MPB ) |
| IFOOD, INC., SHASHKI K. RATTAN, and CHANDRU C. GURNANI, | ) ) ) ) |
| Defendants. | ) |

**ENTRY ON PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**

This matter is before the Court on a Motion for Temporary Restraining Order (Filing No. 12) filed by Plaintiffs Steak n Shake Enterprises, Inc. ("SNS Enterprises") and Steak n Shake, LLC ("SNS") (collectively, "Plaintiffs") against Defendants iFood, Inc. ("iFood"), Shashi K. Rattan ("Rattan") and Chandru C. Gurnani ("Gurnani") (collectively, "Defendants"). Plaintiffs initiated this lawsuit against Defendants for trademark infringement, unfair competition, breach of contract (specific performance and damages), breach of guaranties (damages) (Filing No. 1 at 11–15). Plaintiffs now ask the Court to "enjoin Defendants' trademark infringement and unfair competition, and to enforce their post-termination obligations under the franchise and area development agreements." (Filing No. 13 at 2.) For the following reasons, the Court **grants** Plaintiffs' Motion.

### I. BACKGROUND

Plaintiffs operate and franchise Steak n Shake restaurants, which are known for their hamburgers and hand-dipped milkshakes (Filing No. 14 at 1, 2). SNS owns federally registered trademarks, service marks, trade names, logos, emblems, commercial symbols, and indicia of origin connected to the Steak n Shake brand (the "Steak n Shake Marks"). *Id.* at 2. SNS licenses

the Steak n Shake Marks to authorized Steak n Shake franchisees for use solely connected to the operations of franchised Steak n Shake restaurants. *Id.*

On August 31, 2011, Defendant iFood entered into a written Area Development Agreement ("ADA") with SNS Enterprises, committing to open ten franchised Steak n Shake restaurants within a defined geographic area comprising twenty-one counties in North Carolina and one county in Virginia (Filing No. 14-1 at 1–2, 3, 27–28). The ADA, under a "Development Schedule," required iFood to open a new full-service Steak n Shake restaurant within the development area every six months, starting eighteen months from its effective date, until ten restaurants would be opened by August 31, 2017 (seventy-two months (six years) after the ADA's effective date). *Id.* at 23, 24. At the same time, Defendants Rattan and Gurnani entered into franchise and license agreements with Plaintiffs to operate a full-service franchised Steak n Shake location in Raleigh, North Carolina (*see* Filing No. 15 at 64–67). Over the next several years—on July 28, 2014, April 27, 2017, and March 15, 2018—iFood entered franchise agreements with Plaintiffs to operate two full-service franchised restaurants in Raleigh, North Carolina, and Vienna, West Virginia, and one counter-service franchised restaurant in Garner, North Carolina (*see* Filing No. 14-3 at 81–83; Filing No. 14-4 at 83–86; Filing No. 14-5 at 83–85). Meanwhile, the six-year Development Schedule of the ADA entered into by iFood had been amended on November 1, 2016, allowing iFood additional time to open the restaurants (extending the deadline to November 15, 2020) and permitting four of the ten to now open and operate as counter-service locations (*see* Filing No. 14-2 at 1–3).

Under all the franchise agreements, Rattan and Gurnani personally guaranteed the obligations of iFood (Filing No. 14-3 at 100; Filing No. 14-4 at 100; Filing No. 14-5 at 99; Filing No. 16 at 8–9). These franchise agreements required, among myriad things, Defendants to

1. Pay a "Royalty and System Fee" calculated on the gross receipts from, and certain "Advertising and Marketing Fees" for, each Steak n Shake location;

2. Maintain the interior and exterior condition and appearance of their Steak n Shake restaurants in compliance with agreed upon standards of quality, service, and cleanliness;

3. Purchase equipment, food products, and other items from only those sources approved by SNS Enterprises

(Filing No. 14-3 at 23–24, 30, 37–39; Filing No. 14-4 at 24–25, 30, 39, 40; Filing No. 14-5 at 24–25, 30–31, 39–40; Filing No. 15 at 17, 18, 21–22, 28–29). Breach of these requirements could lead to immediate termination of the franchise agreements (Filing No. 14-3 at 55–60; Filing No. 14-4 at 57–62; Filing No. 14-5 at 57–62; Filing No. 15 at 42–47). Additionally, unauthorized use of the Steak n Shake Marks constitutes grounds for immediate termination of a franchise agreement. *See id.* In the event of termination, Defendants were obligated to (1) cease any and all use of the Steak n Shake Marks and proprietary confidential information; (2) disassociate their former franchised restaurant locations from Steak n Shake restaurants; (3) assign the telephone number and web address associated with their former franchised Steak n Shake restaurants to Plaintiffs; and (4) pay all amounts owed to Plaintiffs and damages sustained by Plaintiffs by reason of the termination of the franchise agreements (Filing No. 14-3 at 61–63; Filing No. 14-4 at 63–64; Filing No. 14-5 at 63–64; Filing No. 15 at 47–48).

In consideration for confidential operational information and the use of the Steak n Shake Marks, franchisees are bound by confidentiality and noncompetition obligations under the franchise agreements (Filing No. 14-3 at 5–6, 51–54, 65–67; Filing No. 14-4 at 5–6, 53–56, 67–69; Filing No. 14-5 at 5–6, 53–56, 67–69; Filing No. 15 at 6, 40–41, 50–51). Importantly, a noncompetition provision instructed that

> [i]n the event of . . . termination of this Agreement for any reason whatsoever, the Franchisee agree(s) that for a period of two (2) years, commencing on the effective date of the . . . termination . . . Franchisee will not have any interest as an owner,

> investor, partner, director, officer, employee, consultant, representative or agent, or in any other capacity, in any Competing Business located at or within five (5) miles of the Authorized Location or any then-existing Steak n Shake or Steak n Shake Signature Restaurant.

(Filing No. 14-3 at 65; Filing No. 14-4 at 67 (nonmaterially different language); Filing No. 14-5 at 67 (same); Filing No. 15 at 15). In turn, "Competing Business" is defined as "any restaurant business that either (i) derives twenty-five (25%) or more of its annual revenue from the sale of ground beef sandwiches; or (ii) offers both ground beef sandwiches and ice cream products (regardless of the volume sold)." (Filing No. 14-3 at 5; Filing No. 14-4 at 5; Filing No. 14-5 at 5; Filing No. 15 at 6.)

Pursuant to this arrangement, Plaintiffs shared with Defendants proprietary and confidential information concerning Steak n Shake, including standards, specifications, operations, and procedures for the restaurants (Filing No. 14 at 4).

Defendants, however, eventually breached the franchise agreements and the ADA by failing to (1) open restaurants consistent with the ADA's schedule; (2) pay the Royalty and System Fees, the Advertising and Marketing Fees, and other remunerations owed Plaintiffs; (3) maintain the requisite repair, appearance and cleanliness of their Steak n Shake restaurants; and (4) purchase equipment, food, and beverages from approved suppliers. *Id.* at 4–6. On July 12, 2021, following numerous warnings and opportunities to cure, written notice of termination of the franchise agreements and ADA was given to Defendants due to these continued breaches. *Id.* at 6; Filing No. 14-10 at 1–3. Though Defendants initially struggled to comply with post-termination debranding deadlines (largely due to complexity of removing large signage), by August 20, 2021, they had completely debranded and deidentified the locations (Filing No. 32-1 at 17). And, as of roughly July 18, 2021, these restaurants now operate as "SEAN'S SHACK" locations ("Sean" is an anglicized version of Gurnani's first name "Chandru"). *Id.* at 17–18.

4

Plaintiffs filed their Complaint in this action on July 28, 2021, alleging claims for trademark infringement and breach of contract ([Filing No. 1](#)). After moving for a preliminary injunction on that same date ([Filing No. 5](#)), Plaintiffs moved for a temporary restraining order ("TRO") on August 9, 2021.  Plaintiffs ask the Court to "enjoin Defendants' trademark infringement and unfair competition, and order Defendants to comply with their post-termination contractual obligations including their covenant not to compete, and all other relief proper in the premises." ([Filing No. 12 at 3](#).)  A hearing on the Motion for a Preliminary Injunction is scheduled for September 8, 2021 ([Filing No. 25 at 1](#)).  The parties requested and the Court agreed to "rule on the Motion for TRO on the briefing."  ([Filing No. 26 at 1](#).)

## II.     LEGAL STANDARD

"The standards that apply to preliminary injunction orders also apply to temporary restraining orders." *J.P. Morgan Sec. LLC v. Weiss*, No. 1:19-cv-4163-TWP-MPB, 2019 WL 6050176, at *4 (S.D. Ind. Nov. 15, 2019) (citing *Loveless v. Chicago Bd. of Election Commissioners*, No. 04 C 5671, 2004 WL 2095662, at *2 (N.D. Ill. Sept. 17, 2004)).  Federal Rule of Civil Procedure 65(b) provides that a TRO may be issued without notice to the adverse party only if "specific facts in an affidavit or a verified complaint *clearly show* that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition."  Fed. R. Civ. Pro. 65(b) (emphasis added.)  Here, however, Defendants have been put on notice regarding Plaintiffs' Motion and have had an opportunity to respond in writing and provide briefing on the legal issues that are before the Court.

To obtain a TRO, the moving party has the burden of showing that "[1] it is likely to succeed on the merits, [2] it is likely to suffer irreparable harm in the absence of preliminary relief, [3] the balance of equities tips in its favor, and [4] issuing an injunction is in the public interest." *Grace Schs. v. Burwell*, 801 F.3d 788, 795 (7th Cir. 2015).  The greater the likelihood

of success, the less harm the moving party needs to show to obtain an injunction, and vice versa. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). A TRO "'is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)) (emphasis in original); *see also Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (granting preliminary injunctive relief is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it").

### III.  DISCUSSION

**A.  Likelihood of success on the merits**

**1.  Trademark and unfair competition claims**

Plaintiffs first maintain that they are likely to succeed on trademark infringement claims under the Lanham Act (*see* Filing No. 13 at 10). Plaintiffs maintain that Defendants continue "to use the registered Steak n Shake Marks and name in connection with the operation of restaurants at the same location as their former Steak n Shake restaurants, and are, thus, holding themselves out to the public in a way that leads them to believe defendants are still associated with Steak n Shake." *Id.* at 11. This, Plaintiffs continue, engenders "customer confusion" and allows Defendants to "trade[e] off of this natural confusion" to elicit bewildered customers. *Id.* at 12.

The Court, however, agrees with Defendants—at least at this TRO stage—that this claim is likely mooted by Defendants' now-completed "debranding process." (Filing No. 32 at 9.) According to Gurnani, "Defendants are not using or displaying any of the SNS marks or logos" and all "signage has now been removed." *Id.* at 10 (citing Filing No. 32-1 at 17). Even viewing images of the restaurants prior to the "full debranding"—with large, exterior signs covered in black

plastic bags, smaller signs removed and replaced, repainting in progress, and other alterations clearly disassociating the restaurants with the Steak n Shake brand (*see* Filing No. 17-1; Filing No. 17-2; Filing No. 17-3; Filing No. 17-4; Filing No. 17-5; Filing No. 17-6)—it seems incredibly improbable that "[t]here is simply no way anyone patronizing defendants' restaurants could possibly know that they are not authorized Steak n Shake restaurants and that the food, beverages and services being sold there are not authorized and approved by Steak n Shake." (Filing No. 13 at 12.)  Accordingly, the Court will move to analysis of the contractual claims.

### 2. Breach of contract claims

Plaintiffs first argue that they will prevail on their "claims to enforce [D]efendants' post-termination obligations under the agreements, including their covenants against competition." (Filing No. 13 at 13.)  Because covenants not to compete "are in restraint of trade, courts enforce them only if they are reasonable." *Heraeus Med., LLC v. Zimmer, Inc.*, 135 N.E.3d 150, 153 (Ind. 2019) (quotation omitted).  "In considering what is reasonable, regard must be paid to three factors: (1) whether the agreement is wider than necessary for the protection of the employer in some legitimate interest; (2) the effect of the agreement upon the employee; and (3) the effect of the agreement upon the public." *Mercho-Roushdi-Shoemaker-Dilley Thoraco-Vascular Corp. v. Blatchford*, 900 N.E.2d 786, 796 (Ind. Ct. App. 2009).  Plaintiffs maintain that the noncompete covenant imposed on Defendants is reasonable because it is limited both geographically and temporally.  Plaintiffs point to Indiana cases upholding similar constraints (Filing No. 13 at 13–14 (citing *Washel v Bryant*, 770 N.E.2d 902 (Ind Ct. App. 2002); *Titus v. Rheitone, Inc.*, 758 N.E.2d 85 (Ind Ct. App. 2001)).  Moreover, Plaintiffs maintain that Defendants breached their "post-termination obligations." *Id.* at 14–15.[1]

---

[1] As this passing assertion is the extent of the parties' discussion concerning this contractual claim, the Court will not pass on its merits at this stage.

7

In response, Defendants do not contest that they are violating the noncompete provision as written. Instead, they initially argue that any noncompetition provision is unreasonable and thus cannot be enforced (Filing No. 32 at 11–19). First, Defendants contend that the noncompetition provision "is not supported by a legitimate protectable interest" because there are now "no SNS restaurants in the Raleigh area." *Id.* at 15. In other words, "[b]ecause SNS lacks any competitive presence in Raleigh, it has no legitimate protectable interest to prop up the SNS Non-Compete." *Id.* And while "the SNS Non-Compete also prohibits the franchisee from operating a Competing Business at the previously franchised locations," Defendants question "the protectable interest supporting that restriction when SNS has zero competitive presence in that market." *Id.* at 16.

Second, Defendants maintain that the geographic scope of the noncompete provision is unreasonable: they argue that Plaintiffs "cannot restrict Defendants from doing business in a market or geography where Plaintiffs do not do business, where they do not operate restaurants, either directly through company stores or indirectly through franchised locations." *Id.* at 17–18. Third, Defendants contend the noncompete provision is "otherwise overly broad" because it would functionally bar them from taking part in the restaurant industry. *Id.* at 18–19.

Defendants also maintain that Plaintiffs first materially breached the franchise agreements, which excuses Defendants from any valid noncompetition obligation. They argue "SNS failed to provide any training to Defendants in the SNS franchise system [and] failed to provide advertising and marketing support." *Id.* at 19–21; *see A House Mechanics, Inc. v. Massey*, 124 N.E.3d 1257, 1262 (Ind. Ct. App. 2019) ("It is well established that '[w]hen one party to a contract commits the first material breach of that contract, it cannot seek to enforce the provisions of the contract against the other party if that other party breaches the contract at a later date.'") (quoting *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 917 (Ind. Ct. App. 2011)). Defendants forewarn that they "will be

asserting counterclaims for prior breaches by SNS that go to the very heart of the franchise contract and the franchise relationship." (Filing No. 32 at 20.)

The Court is persuaded that the noncompetition provision is reasonable and thus enforceable. First, the noncompete provision is supported by a protectable interest; namely, that Plaintiffs could choose to "refranchise" in Raleigh and Garner, North Carolina (see Filing No. 13 at 18). Even though there are apparently no Steak n Shake locations in the geographic region at this time, Plaintiffs clearly saw the potential for those restaurants in the area and may wish to reestablish locations there now that those operated by Defendants have closed. Second, the geographic scope of the noncompete provision is not unreasonably broad when, again, Plaintiffs may elect to reenter that market, and the barred territory is constrained to "within five (5) miles of the Authorized Location or any then-existing Steak n Shake or Steak n Shake Signature Restaurant." (Filing No. 14-3 at 65; Filing No. 14-4 at 67 (nonmaterially different language); Filing No. 14-5 at 67 (same); Filing No. 15 at 15; *see, e.g.*, *Washel*, 770 N.E.2d at 904 ("Bryant could not open a competing shop within ten miles for two years from the date she left employment."); *Titus*, 758 N.E.2d at 88–89 ("Employee agrees that . . . for a period of three (3) years from the termination of Employee's employment, for any reason, Employee will not . . . engage in . . . the businesses of Employer. The geographic region to which the prohibitions and covenants enumerated in this Section VI shall be all counties located in the State of Indiana.").) Third, the noncompete provision was not otherwise overly broad in that it was limited to only any restaurant "that either (i) derives twenty-five (25%) or more of its annual revenue from the sale of ground beef sandwiches; or (ii) offers both ground beef sandwiches and ice cream products (regardless of the volume sold)." (Filing No. 14-3 at 5; Filing No. 14-4 at 5; Filing No. 14-5 at 5; Filing No. 15 at 6.) Paired with the fairly limited geographic restraint, Defendants would not be

unreasonably precluded from working in the restaurant industry, and the noncompete provision is reasonable with respect to the legitimate interests of the employer, restrictions on the employee, and the public interest.

As for prior breach by Plaintiffs, Defendants fail to point to any portions of the franchise agreements indicating that Plaintiffs were contractually obligated to visit these locations to provide operational guidance, training, and assistance or conduct advertising or marketing in the Raleigh market (*see* Filing No. 32-1 at 15–16). Instead, Defendants rely on Gurnani's "25-years' experience with multiple franchisors." *Id.* at 16. But this extra-contractual evidence cannot establish prior breach of these franchise agreements on the part of Plaintiffs, especially when cursory review of the agreements indicate that Plaintiffs had full discretion in providing the type of support of which Defendants now complain lacked (*see, e.g.*, Filing No. 15 at 11–12 (indicating that "[t]he Franchisor agrees to provide . . . [p]eriodic inspections and evaluations of Franchisee's operations as Franchisor may elect to provide in its sole discretion"), 27 (noting that "[t]he Franchisor or its affiliate may elect to provide the following discretionary services to Franchisee, but shall have no legal or contractual obligation to provide such services"), 30 (detailing that "[t]he Franchisor does not represent or warrant that any particular restaurant will benefit directly or pro rata from marketing or advertising")). As the Indiana Supreme Court held long ago,

> [w]hile it is true that a usage of trade may sometimes be proved in order to ascertain the manner of discharging some duty, or performing an act stipulated to be performed in a contract, such proof is never competent, however, when the effect of it would be to prove a usage inconsistent with the express terms of the contract. . . . Where words of ordinary signification are found in a contract, it is for the court to give an interpretation to such words, as well as to the whole contract. It is only where a word or phrase, as used in a particular trade or calling, has a meaning peculiar to such trade, and different from the ordinary sense in which it is used, that evidence may be heard to explain the use of the word. Even then, such evidence will not be heard to contradict the contract, or explain away its obligation.

*Seavey v. Shurick*, 110 Ind. 494, 11 N.E. 597, 598–99 (1887) (citation omitted); *see also Washel*, 770 N.E.2d at 906 ("In interpreting an unambiguous contract, we give effect to the intentions of the parties as expressed in the four corners of the document. Clear, plain, unambiguous terms are conclusive of that intent. We will neither construe clear and unambiguous provisions nor add provisions not agreed upon by the parties.") (citations omitted).

In sum, Plaintiffs have, at this early stage, established a likelihood of success on the merits of their contractual claims against Defendants (*contra* Filing No. 32 at 23 ("[E]ven if by some wild stretch of the imagination the Court were to find that Plaintiffs were likely to prevail on the merits . . . ").

**B.** **Likelihood of irreparable harm**

Plaintiffs contend that the conduct of Defendants has "caused, and unless enjoined will continue to cause, irreparable harm to Steak n Shake in several ways." (Filing No. 13 at 15.) First, "Steak n Shake's loss of customer goodwill 'amounts to irreparable injury because the damages flowing from such losses are difficult to compute,' and 'the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm' Steak n Shake." *Id.* at 16 (quoting *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007)). Second, because Defendants operated the restaurants "for years . . . [,] [e]nforcement of defendants' non-competition covenants is, therefore, 'essential to allow time for the public . . . associati[on]' of defendants with the Steak n Shake brand to dissipate." *Id.* at 17. (quoting *Bad Ass Coffee Co. of Haw., Inc. v. JH Nterprises, L.L.C.*, 636 F. Supp. 2d 1237, 1249 (D. Utah 2009)). Third, "enforcement of defendants' non-competition covenants is necessary to prevent Defendants' continued use of Steak n Shake's trade secrets and confidential information." *Id.* Fourth, "Defendants' violation of their non-competition covenants undermines Steak n Shake's ability to protect its goodwill in Raleigh and Garner, North Carolina by refranchising that market."

11

*Id.* at 18.  Fifth, "Defendants' actions threaten the stability of the entire Steak n Shake franchise system [because d]enial of preliminary injunctive relief would foreclose any meaningful remedy for Defendants' misconduct, and might 'send[ ] a message to other franchisees that the Agreement does not protect [the franchisor] and may be disregarded at will.'"  *Id.* (quoting *Quizno's Corp. v. Kampendahl*, No. 01 C 6433, 2002 WL 1012997, at *7 (N.D. Ill. May 20, 2002)).  Moreover, Plaintiffs continue,

> Steak n Shake's other franchisees would be harmed as well [because a] former franchisee's disregard of his covenant not to compete and continued use of Steak n Shake's confidential information and know-how dilutes the competitive advantage that Steak n Shake's confidential information, know-how and goodwill affords all Steak n Shake franchisees.

*Id.* at 19.  Finally, use of the same telephone number causes continuing irreparable harm because that number "appears in various telephone and internet directories and through search engines as being affiliated with Steak n Shake".  *Id.*

In response, Defendants question "what harm could Plaintiffs suffer from Defendants selling hamburgers, hotdogs, and french fries at their SEAN'S SHACK-branded restaurant when SNS has zero competitive presence in the Raleigh marketplace?"  ([Filing No. 32 at 22](#) (citations omitted).)  Because "Plaintiffs have not presented any evidence that they have imminent concrete plans to open a new Shake 'N Steak restaurant in the Raleigh market . . . , any such harm would be speculative and remote."  *Id.*  Indeed, "Plaintiffs have not presented *any* evidence of irreparable harm.  Nor could they if they tried."  *Id.* at 23 (emphasis in original).

The Court finds that Plaintiffs will suffer irreparable injury, primarily because Plaintiffs' "ability to re-franchise the area will be compromised if a former franchisee is allowed to operate in the area under a different name.  An injury to these interests cannot be accurately or easily measured by an award of damages."  *Merry Maids, L.P. v. WWJD Enterprises, Inc.*, No. 8:06CV36,

2006 WL 1720487, at *11 (D. Neb. June 20, 2006), *on reconsideration in part*, No. 8:06CV36, 2006 WL 2040245 (D. Neb. July 20, 2006). Indeed, as Plaintiffs note, permitting continued operation of a business violating noncompete agreements could undermine the quintessential purposes of such provisions (such as limiting geographic association with a business, curtailing misappropriation of insider "know how," and providing a franchisor the ability to refranchise absent unfair competition), and express the Court's acquiescence to the deliberate flouting of them. In sum, Plaintiffs have demonstrated that they will suffer irreparable harm if the Court does not provide it the equitable relief it seeks.

### C. Balance of equities

Plaintiffs contend that because Defendants are "willful violators of their covenant not to compete," the Court should give little weight to any harm they may suffer because said harm "will be derived from their own breach of the franchise agreements." ([Filing No. 13 at 19](#).) Moreover, "Defendants would remain free to operate a similar business outside of the five-mile radius of their former location or other Steak n Shake locations or development area, to operate any other business anywhere, and to operate any type of business anywhere after the non-competition period expires." *Id.* at 20. Indeed, the only harm that Defendants would suffer—"loss of revenue"—is not to be considered irreparable harm. *Id.* at 21.

In response, Defendants maintain that SNS (1) "saddled Defendants with a broken franchise model and with poor locations," (2) "committed prior material breaches," (3) "ignored or refused every entreaty from Defendants for assistance with their struggling franchises or to allow Defendants to take cost cutting measures that would allow them to weather the storm," (4) "failed or refused to train Defendants," (5) "failed to maintain a franchise director to provide help and guidance to franchisees," (6) "failed or refused to advertise and market the STEAK 'N SHAKE mark in the Raleigh marketplace," (7) "has not developed any new food products or otherwise

enhanced its competitive offering since 2017," and (8) "terminated Defendants' franchise agreements in the middle of a pandemic." (Filing No. 32 at 23–24.)

The Court once more agrees with Plaintiffs—the balance of harms weighs in its favor. Under this inquiry, the Court "must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest." *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 816 (7th Cir. 2018), *judgment vacated on other grounds sub nom. Box v. Planned Parenthood of Indiana & Kentucky, Inc.*, 141 S. Ct. 184 (2020). Here, Defendants' argument primarily airs an abundance of grievances against Plaintiffs without clarifying any harm that would be suffered were the Court to issue a TRO. And the harm that would obviously be suffered—that is, a loss of income—is not the type of irreparable injury contemplated by the Court in this analysis. *See P.P. & K., Inc. v. McCumber*, 46 F.3d 1134 (unpublished), 1995 WL 46207, at *3 (7th Cir. 1995) ("McCumber's sole source of income is the store . . . [but] the harm McCumber will suffer does not render injunctive relief inappropriate."). Accordingly, the Court finds that this balance weighs in favor of Plaintiffs, who, as the Court described above, would suffer irreparable harm in the absence of a TRO.

**D.      Public interest**

Finally, Plaintiffs maintain that injunctive relief would "promote the public interest by upholding and enforcing contractual commitments." (Filing No. 13 at 21 (citing *Raymundo v Hammond Clinic Ass'n*, 449 NE.2d 276, 279 (Ind. 1983).) In response, Defendants contend that (1) "iFOOD's will default on its SBA loans, loans that are guaranteed via public funds paid by taxpayers," (2) "iFOOD will also default on its leases, such that its landlords will lose the revenue stream from those rents," (3) "iFOOD employs many people at the three (3) SEAN'S SHACK restaurants and, if forced to close, those employees and their families will lose their livelihoods,"

14

and (4) "if this Court were to enter the requested TRO, it would in fact alter the status quo rather than maintain it to prevent harm to the parties." (Filing No. 32 at 24–25.)

Again, the Court agrees with Plaintiffs. Defendants primarily (and erringly) focus their public interest argument on the specific harm that would flow from their discrete inability to fulfill their obligations to others because of the TRO. In other words, Defendants repackage their own limited interests as that of the greater public. On the other hand, however, Indiana courts over many years have made clear that the enforcement of contractual obligations is an important public interest:

> The courts will keep in mind the principle that it is to the best interest of the public that persons should not be unnecessarily restricted in their freedom of contract and that their agreements are not to be held void as against public policy, unless they are clearly contrary to what the Constitution, the Legislature, or the judiciary have declared to be the public policy, or unless they clearly tend to the injury of the public in some way.

*Hodnick v. Fid. Tr. Co.*, 96 Ind. App. 342, 183 N.E. 488, 491 (1932) ("in Banc"); *see also Pond v. Pond*, 700 N.E.2d 1130, 1136 (Ind. 1998) ("It is well established that the public policy of this state generally favors the freedom of contract between private parties."). Considering the disparity between these interests, public policy favors the Court issuing a TRO.

After examining the pertinent factors, the Court finds that Plaintiffs' TRO Motion should be granted (*contra* Filing No. 32 at 25 n.5 ("If the Court somehow finds that Plaintiffs' TRO Motion should be granted . . . ")).

### IV. CONCLUSION

Plaintiffs have clearly shown that they are likely to succeed on the merits of their claims and suffer irreparable harm, that a balance of equities weigh in their favor, and that public interest favors the issuance of a TRO. Accordingly, Plaintiffs' Motion for Temporary Restraining Order, (Filing No. 12), is **GRANTED**. "Defendants request that Plaintiffs be required to post a TRO

bond and would ask the Court's leave to address the amount of the bond at that time." (Filing No. 32 at 25 n.5.) To the extent that the Court must consider the appropriateness of a bond more fully, that request is **granted**. This TRO shall remain in effect for **fourteen (14) days** after the date of issuance, or until any earlier additional order of the Court, or until a later date if Defendants consent to a longer extension. Plaintiffs' Motion for Preliminary Injunction remains scheduled for hearing on **September 8, 2021**.

    **SO ORDERED.**

Date of Issuance: 8/25/2021 _____

Time of Issuance: 9:13 a.m. _____

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Kay Dee Baird
KRIEG DEVAULT LLP (Indianapolis)
kbaird@kdlegal.com

Scott Stuart Morrisson
KRIEG DEVAULT LLP
smorrisson@kdlegal.com

William J. Anaya
GREENSFELDER HEMKER & GALE PC
wanaya@greensfelder.com